[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11993

_____

D. C. Docket No. 07-61249-CIV-KAM

OMAR BLANCO,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS, et. al.,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 31, 2012)

Before TJOFLAT, PRYOR, and EDMONDSON, Circuit Judges.

TJOFLAT, Circuit Judge:

On June 15, 1982, a jury in the Broward County Circuit Court, Florida, convicted Omar Blanco of the first-degree capital murder[1] of John Ryan and armed burglary[2] of the residence where Ryan was living. On June 21, 1982, the court, accepting the jury's sentencing recommendation on the murder conviction, sentenced Blanco to death. The court also sentenced Blanco to seventy-five years' imprisonment for the armed burglary conviction. The Florida Supreme Court affirmed Blanco's convictions and death sentence;[3] the supreme court thereafter denied Blanco collateral relief.[4]

In 1987, Blanco petitioned the United States District Court for the Southern District of Florida for a writ of habeas corpus[5] to set aside his convictions and sentences. The District Court denied the writ as to his convictions but granted the writ as to his death sentence on the ground that he had been denied his Sixth and

---

[1] Fla. Stat. § 782.04 (1982).

[2] Fla. Stat. § 810.02 (1982).

[3] Blanco v. State, 452 So. 2d 520 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S. Ct. 940, 83 L. Ed. 2d 953 (1985).

[4] Blanco v. Wainwright, 507 So. 2d 1377 (Fla. 1987) (affirming the Broward County Circuit Court's denial of Blanco's motion to vacate).

[5] See 28 U.S.C. § 2254.

2

Fourteenth Amendment right to effective assistance of counsel[6] in the penalty

phase of his case.[7]  We affirmed.[8]

Blanco's case was thereafter returned for a new penalty-phase proceeding to

the Broward County Circuit Court.[9]  It yielded the same result as the earlier

proceeding: the jury recommended the death penalty and the court imposed it.  In

this appeal, we decide whether a writ of habeas corpus should issue vacating

Blanco's death sentence.  The District Court for the Southern District of Florida

decided that it should not.  We agree and therefore affirm its judgment.

I.

We begin our review of the District Court's judgment by describing what

---

[6]  The Sixth Amendment, reading in pertinent part, "In all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence," U.S. Const. amend. VI, has previously been applied to the States by the Supreme Court, see Gideon v. Wainwright, 372 U.S. 335, 345, 83 S. Ct. 792, 797, 9 L. Ed. 2d 799 (1963).  The Court has also held that the "Assistance of Counsel" means the "effective" assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

[7]  Blanco v. Dugger, 691 F. Supp. 308, 333 (S.D. Fla. 1988).

[8]  Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991).

[9]  At the conclusion of the penalty phase, only two sentences were possible: a death sentence or life with the possibility of parole after 25 years.  See Fla. Stat. § 775.082 (1983) ("A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than 25 years before becoming eligible for parole unless the proceeding held to determine the sentence . . . results in findings by the court that such person shall be punished by death[.]"); Sandoval v. State, 884 So. 2d 214, 216 (Fla. 2d Dist. Ct. App. 2004) (citing Sanders v. State, 787 So. 2d 264, 265 (Fla. 2d Dist. Ct. App. 2001) (describing the sentence as "predetermined" if the death penalty is not sought)).

3

took place during the new penalty phase, from the time the Blanco v. Singletary mandate reached the Broward County Circuit Court until the death sentence was imposed. From there, we discuss the review of the sentence by the Florida Supreme Court, which sustained it on direct appeal and, later, on collateral review. After that, we review the District Court's entertainment and rejection of Blanco's petition for a writ of habeas corpus.

A.

The new penalty phase began with the appointment of counsel to represent Blanco, who was indigent.[10] The court appointed Hilliard E. Moldof, a private practitioner, on June 12, 1992. Judith Hall, a Capital Collateral Representative,[11] assisted Moldof, but did not appear as his co-counsel of record. Having made this appointment, the court next inquired whether the parties were ready to proceed. The State notified the court that it was ready to proceed in order to pursue the death penalty.[12] Moldof, after consulting with Blanco, told the court that Blanco was not

---

[10] Counsel who represented Blanco in the 1982 trial proceedings were discharged once Blanco alleged in his post-conviction proceedings in the Circuit Court and the United States District Court that their performance in handling his case had been constitutionally deficient.

[11] The Office of the Capital Collateral Representative (the "CCR"), was the predecessor to the Office of the Capital Collateral Regional Counsel. See Fla. Stat. §§ 27.705(3), 27.7001.

[12] The State appealed the District Court's issuance of the writ vacating Blanco's death sentence; Blanco appealed the court's denial of the writ as to his convictions. Both parties failed to obtain certiorari review in the Supreme Court. Singletary v. Blanco, 504 U.S. 946, 112 S. Ct. 2290, 119 L. Ed. 2d 213 (1992); Blanco v. Singletary, 504 U.S. 943, 112 S. Ct. 2282, 119 L. Ed.

ready to proceed, and the court then granted a continuance.

1.

On June 19, 1992, Moldof moved the Circuit Court to appoint a psychologist to assist him in the presentation of mitigating evidence, citing Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).[13]  On August 28, 1992, Moldof, representing that he needed the assistance of a neuropsychologist, a neurologist, and a sociologist, filed three motions requesting that the court provide for the appointment of these specialists.  Moldof named the neuropsychologist and sociologist he wanted appointed, Dr. Dorita Marina and Dr. Juan Clark, respectively, but he did not provide the name of a neurologist.  On September 11, 1992, the court granted the August 28 motions in three orders.  One order appointed Dr. Marina; the other orders simply provided for the appointment of a neurologist and a sociologist without naming the specialists.[14]  Although the record does not contain the orders of appointment, Moldof apparently obtained the

2d 207 (1992).

[13]  The record does not reveal whether this motion was granted.

[14]  After Moldof filed the August 28 motion, he was unable to locate Dr. Clark.  This explains why the court's September 11 order granting Moldof's request for a sociologist did not provide for Clark's appointment.

5

assistance of a neurologist and a sociologist at some point.[15]

At some point during the ensuing eight and a half months, Dr. Marina, having the benefit of the information provided by the other specialists, told Moldof that a psychiatrist was needed. Dr. Marina's suggested that a psychiatrist was necessary to review the mental health information at hand and to form an opinion as to whether a case could be made that, at the time of the murder, Blanco was experiencing "an extreme mental or emotional disturbance" or lacked the "capacity to appreciate the criminality of his conduct," both of which constitute mitigating circumstances under Florida law.[16]

On May 27, 1993, Moldof moved the court for the appointment of a psychiatrist. Because Blanco did not speak English, the psychiatrist needed to be fluent in Spanish. The court granted the motion on June 18, 1993, and appointed the physician Moldof chose, Dr. Anestasio Castiello,[17] a Spanish-speaking

---

[15] See Blanco v. State, 706 So. 2d 7, 10 (Fla. 1997) ("[I]n addition to appointing Dr. Maulion, the court appointed, at county expense, a psychologist, a neuropsychologist, a neurologist, and a sociologist to assist in Blanco's defense.").

[16] Fla. Stat. § 921.141(6)(b) (1983) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); Id. § 921.141(6)(f) (1983) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

[17] The record reflects that Dr. Castiello was sometimes referred to as Dr. Richard Castillo.

psychiatrist in Dade County.  Dr. Castiello declined the appointment,[18] so Moldof

asked the court to appoint Dr. Arturo Gonzales, also a Spanish-speaking

psychiatrist.  The State argued that the fees he would charge would be too high,

and the court agreed.[19]  The court suggested that Moldof consider the appointment

of Dr. Richard Maulion, who also was fluent in Spanish.  Moldof contacted Dr.

Maulion, and Dr. Maulion said that he would be willing to take the appointment.

Moldof conveyed this information to the court at a pretrial hearing on August 10,

1993.  At this hearing, the court asked Moldof, "Are you satisfied with him?"

Moldof replied, "Yes, sir.  He seems to be qualified.  He is Spanish speaking.  He

seems to have all of the tools, at least, to be able to accomplish what we're

seeking."  Given this response, the court entered an order appointing Dr. Maulion.

At a hearing on September 8, 1993, Moldof reported on his interaction with

Dr. Maulion.  He said to the court, "I've seen his work[].  He seems to be more

than acceptable.  He is doing an excellent job."  At that same hearing, Moldof

---

[18]  After contacting Dr. Castiello and providing him with a copy of the Circuit Court's administrative order regarding expert fees in Broward County, Moldof reported to the court that Dr. Castiello refused to come to Broward County at the rates prescribed by the court's order. The order provided for the payment of psychiatrists at the rate of $150 per psychiatric evaluation.  Deposition and court testimony was payable at the rate of $150 per hour.  All other time spent on a defendant's case including research, documentation review, and consultation with counsel, was paid at the maximum rate of $50 per hour.

[19]  Dr. Gonzales was willing to take the appointment for a daily fee of $2,000.  The State objected on the ground that such a fee would exceed the limits set out in the administrative order.  See supra note 18.

commented that Dr. Maulion "says he needs a neuropsychologist and [a] neurologist to do some testing of Mr. Blanco to confirm what he thinks he's finding. I've already got permission."[20] Moldof reiterated the need for a neuropsychologist at status hearings on September 13 and September 24. Then, on October 1, 1993, the court entered an order appointing Dr. Lee Bukstel, a neuropsychologist.

In addition to obtaining the appointment of these mental health experts, Moldof obtained discovery of evidence the State would be presenting to the jury in the second penalty phase. Some of the discovery requests sought evidence the State would be introducing in support of its case for a death sentence recommendation. The State notified Moldof that, to establish the aggravated circumstance that the defendant had previously been convicted of a "felony involving the use or threat of violence to the person,"[21] it would be introducing certified copies of Blanco's 1984 convictions in the Broward County Circuit Court for the armed robbery[22] and armed burglary[23] of a residence in the Emerald Hills

---

[20] Dr. Marina was unable to perform a neuropsychological evaluation of Blanco, and a neurologist, though provided for in the court's September 11, 1992 order, had apparently not been engaged by this time.

[21] Fla. Stat. § 921.141(5)(b) (1983).

[22] Florida statutes defined robbery during the time period at issue as:

 (1) "Robbery" means the taking of money or other property which may be the

8

community on December 29, 1981.[24]  The crimes had been committed a little more

than two weeks before the Ryan murder.  At a subsequent pretrial conference,

Moldof and the State stipulated to the introduction of certified copies of Blanco's

March 14, 1984, convictions of those two felonies.

---

subject of larceny from the person or custody of another by the use of force, violence, assault, or putting in fear.

(2) (a) If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 812.13(1), (2)(a) (1983).

[23]  Under Florida law, armed burglary was defined as follows at the relevant time:

(1) "Burglary" means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.

(2) Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084, if, in the course of committing the offense, the offender:

(a) Makes an assault or battery upon any person; or

(b) Is armed or arms himself within such structure or conveyance, with explosives or a dangerous weapon.

Fla. Stat. § 810.02(1)–(2) (1983).

[24]  Blanco was convicted of these offenses twice, on April 9, 1982, and, on retrial, on March 14, 1984.  The State introduced evidence of the April 9 convictions at Blanco's 1982 trial to establish the prior violent felony aggravating circumstance.  The convictions were subsequently reversed on appeal and a new trial ordered.  Blanco v. State, 438 So. 2d 404, 405 (Fla. 4th Dist. Ct. App. 1983).  On retrial, Blanco was convicted again, and, on appeal, the convictions were affirmed.  Blanco v. State, 466 So. 2d 1152, 1152 (Fla. 4th Dist. Ct. App. 1985) (per curiam).

9

2.

The new penalty phase of Blanco's trial began on April 18, 1994. The State's case in chief contained evidence that the State had presented during the guilt phase of the 1982 trial, so that the jury would know how the murder of John Ryan occurred and how Blanco came to be identified as the assailant. The witnesses the State called and the physical evidence it introduced established the following facts.

On the evening of January 14, 1982, Thalia Vezos, age fourteen, was at home in bed, reading a book. At around 11 p.m., she noticed a man in the hallway outside her bedroom; he had a gun and was carrying a brown wallet-type object. The man gestured to Thalia to keep silent, entered her room, and cut the wires to her telephone. After leaving Thalia's room, the man encountered Thalia's uncle, John Ryan, in the hallway. A struggle ensued and the man shot Ryan. Ryan stumbled into Thalia's bedroom and fell on Thalia, who was still on her bed. The man followed Ryan into the bedroom, shot him an additional six times, and fled. After the man left the house, Thalia ran next door to a neighbor's house and called the police.

After the police arrived on scene, they interviewed Thalia. She described the intruder as an Hispanic male, measuring between 5'8" and 5'10" and weighing

10

between 180 and 190 pounds.  The police also interviewed George Abdeni, who lived across the street from the Vezoses.  Abdeni related that he had seen an individual with physical characteristics like those Thalia had described walking east from the scene of the crime.  He was wearing a gray jogging suit.  The police dispatcher immediately issued a police BOLO with the information Thalia and Abdeni had provided.

Officer Curtis Price was on duty in his car near the location of the crime, heard the BOLO over his police radio, and began looking for someone of that description.  Approximately fifteen minutes later, he saw an individual who matched the description provided by the BOLO riding a bicycle down highway A1A.  Officer Price followed this individual, later determined to be Blanco, for approximately one-tenth of a mile and called for backup.

After the backup arrived, Blanco was placed under arrest and taken to the scene of the crime.  There, the officers presented Blanco to Abdeni, who identified him as the individual he had seen.  The police searched the Vezoses' residence and found a man's purse near the door to Thalia's bedroom; the purse contained Blanco's identification papers and Thalia's watch.  Police also recovered seven shell casings from a .380 caliber automatic firearm scattered in Thalia's bedroom and the adjacent hallway.

When they completed their work at the crime scene, the police took Blanco

11

to the police station.  After he was booked, his hands were tested for gunshot residue.  The next day, January 15,  Thalia identified him in a line-up as the intruder.  The results of the tests of his hands revealed a level of antimony and barium—indicating gunshot residue—on the back and palm of the right hand and on the palm of the left hand.

In accordance with the parties' pretrial stipulation, the State introduced a certified copy of the March 14, 1984, convictions for the armed burglary and armed robbery of an Emerald Hills residence on December 29, 1981; the date of these convictions indicates that Blanco committed those crimes shortly after he arrived in the United States from Cuba in 1980, in what was known as the "Freedom Flotilla."[25]  The State then rested its case.  Blanco's defense followed.

Moldof began the presentation of Blanco's defense by calling ten lay witnesses to the stand and introducing written statements of Blanco's mother and father, who were in Cuba.  He then called two of his mental health experts, Dr. Maulion and Dr. Bukstel, to testify.

Dr. Maulion stated that his examination of Blanco, his review of Blanco's medical records, and his study of the reports and information provided by the other court-appointed experts revealed that Blanco had a "central nervous system brain

_____

[25] Mariel Boatlift, U.S. Coast Guard Alien Migrant Interdiction, http://www.uscg.mil/hq/cg5/cg531/AMIO/mariel.asp (last visited May 1, 2012) (describing U.S. Coast Guard activity during the so-called "Mariel Boatlift," a.k.a. the "Freedom Flotilla").

12

injury, [a] history of seizures and fits, and present cognitive impairment." A person with Blanco's diagnosis, he said, "can be perfectly all right now and in just a moment's notice, he can turn around and be either irritable, sad, depressed, angry, or violent." He stated that the brain damage could trigger a startled response if Blanco were confronted with a situation like the one he experienced when he encountered John Ryan on the night of the murder. In Dr. Maulion's opinion, Blanco committed the crime while "under the influence of an extreme mental or emotional disturbance," and his "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."[26]

Moldof then chose to call Dr. Bukstel to the witness stand to follow Dr. Maulion. Dr. Bukstel opined that, based on his examination of Blanco and his review of a battery of psychological tests and records provided by medical professionals in Cuba, Blanco had a number of "organic" factors indicating some level of brain damage, a seizure disorder, and mental retardation. He disagreed with Dr. Maulion, however, about whether the medical evidence established the statutory mitigating factors Dr. Maulion had found. In his view, Blanco had not committed the Ryan murder "while . . . under the influence of extreme mental or emotional disturbance," and he had been able "to appreciate the criminality of his

---

[26] See supra note 16 (explaining the two statutory mitigating circumstances).

13

conduct." He agreed, though, with Dr. Maulion's opinion that Blanco's ability "to conform his conduct to the requirements of law was substantially impaired." After Dr. Bukstel testified, the defense rested. The State put on no rebuttal.

3.

On May 5, 1994, the jury returned its verdict. By a vote of ten to two it recommended that the court impose a death sentence. The court scheduled Blanco's sentencing hearing for January 6, 1995. Prior to the hearing, the parties submitted sentencing memoranda. The State argued in its memorandum that three statutory aggravators had been established: Blanco had previously committed a violent felony, Fla. Stat. § 921.141(5)(b) (1983); the capital felony was committed while Blanco was engaged in the commission of armed burglary, id. § 921.141(5)(d) (1983); and the murder was committed for pecuniary gain, id. § 921.141(5)(f).[27]

In his memorandum, Moldof argued that two statutory mitigating circumstances applied: the capital felony was committed while he was under the influence of extreme mental or emotional disturbance, id. § 921.141(6)(b) (1983), and Blanco's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, id. § 921.141(6)(f)

---

[27] The State conceded that the second and third aggravating capital factors should be considered as one because each was based on essentially the same aspect of the capital crime.

(1983).  Moldof argued, in addition, that fourteen non-statutory mitigating circumstances applied.[28]

On January 6, the day of the sentencing hearing, the court asked counsel whether there were any issues that needed to be settled.

THE COURT:  Is there anything to discuss at this time prior to sentencing?

. . . .

MR. MOLDOF: Your Honor, nothing other than I was looking through my sentencing memorandum we submitted to the Court and I could have sworn that in the sentencing memorandum I had placed the portion of the argument relating to the idea that in my view of the case one of the—probably one of the more important failings, if I look back and see things we did wrong, is when Dr. Maulion testified.

I felt like he was really not a forceful witness for the defense and, you know, we were here when he made the statement about not seeing Mr. Blanco in the courtroom.  When I think the case over and over, I think that weighed heavily against us with the jury.

. . . .

THE COURT:  There were no complaints at all up to the testimony.

MR. MOLDOF:  No question.  And quite frankly, I guess one of the—you know, if that's my fault, then it's my fault.  One of the problems is, you know, psychiatry is as much an art as a science to me.

---

[28]  Blanco's (1) potential for rehabilitation; (2) fatherhood; (3) dull intelligence; (4) impoverished background; (5) organic brain damage; (6) unwavering declaration of innocence; (7) oppression in Cuba; (8) good character; (9) strong religious beliefs; (10) cooperation with police; (11) loving family relationships; (12) treatable mental disorders; (13) Mariel refugee status; and (14) stress from adaption to American culture.

15

Following this exchange, the hearing commenced, and after entertaining the parties' submissions and arguments, the court announced its findings. The court found two aggravating circumstances—that Blanco previously had committed a violent felony and that he committed the Ryan murder during an armed burglary and for pecuniary gain; one statutory mitigating circumstance—that Blanco's ability to conform his conduct to the requirements of law was substantially impaired;[29] and eleven non-statutory mitigating circumstances.[30] The court concluded that the aggravating factors outweighed the mitigating factors and therefore imposed a death sentence.

## B.

Blanco appealed his sentence to the Florida Supreme Court. He presented seven claims of trial court error in the second penalty phase of his case. Only one is before us in this appeal: Blanco argued that the trial court denied him due

---

[29] The trial court rejected the statutory mitigating circumstance that Blanco acted while under a extreme mental or emotion disturbance. In doing so, the court found Dr. Maulion's testimony that this mitigator applied unpersuasive, agreeing with Dr. Bukstel's opinion on the issue. The court also found the first part of the "capacity to appreciate the criminality of his conduct" circumstance inapplicable, again rejecting Dr. Maulion's opinion on that point, but found applicable the second part of that mitigator, as to which both experts agreed: the ability to "conform his conduct to the requirements of law was substantially impaired."

[30] The court found the following mitigators: Blanco's (1) potential for rehabilitation; (2) fatherhood; (3) dull intelligence; (4) impoverished background; (5) organic brain damage; (6) unwavering declaration of innocence; (7) oppression in Cuba; (8) good character; (9) strong religious beliefs; (10) cooperation with police; and (11) loving family relationships. The court rejected the remainder of the non-statutory mitigating circumstances that Moldof urged it to find because he had presented no evidence in support of those circumstances.

16

process of law when it refused to appoint the mental health expert of his choice,

Dr. Arturo Gonzales, in violation of Ake.[31]  Instead, the court appointed a

psychiatrist, Dr. Maulion, who was ineffective in that he failed to provide the

defense with competent psychiatric assistance at trial.  The Florida Supreme Court

found no merit in this argument, Blanco v. State, 706 So. 2d 7, 6–7 (Fla. 1997)

(internal citation omitted), nor did it find any merit in any of the other claims of

error Blanco asserted.  The Florida Supreme Court therefore affirmed Blanco's

sentence, id. at 11.  After the United States Supreme Court denied certiorari

review, Blanco v. Florida, 525 U.S. 837, 119 S. Ct. 96, 142 L. Ed. 2d 76 (1998),

Blanco returned to the Broward County Circuit Court and, on May 29, 2001,[32]

moved the court to vacate his sentence pursuant to Florida Rules of Criminal

Procedure 3.850 and 3.851.[33]  It was the fourth post-conviction motion Blanco had

---

[31]  Dr. Gonzales was Blanco's second choice, after Dr. Castiello declined an appointment. See supra part I.A.1.

[32]  This is the date Blanco filed his amended motion.  Blanco originally filed this collateral attack on September 16, 1999.

[33]  Florida Rules of Criminal Procedure 3.850 and 3.851 both set out the procedure to file post-conviction motions in Florida.  Currently, Rule 3.851 provides the proper vehicle for collateral relief in a case in which the death penalty has been imposed.  This rule was adopted in 1993, well into Blanco's various collateral attacks, and as a result, his attorneys over the years have filed his motions under Rule 3.850, Rule 3.851, or both rules.  For convenience, we refer to all of his post-conviction motions as Rule 3.850 motions.

17

filed in the case.[34]

His motion presented twenty-two claims. We review two of the claims in this appeal. One is that Moldof rendered ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, in failing adequately to inform Blanco, before the commencement of his second penalty phase on April 18, 1994, of the State's offer of a life sentence with eligibility for parole after twenty-five years.[35] The other claim is that in the period immediately before resentencing (1992-1994), the State disregarded its discovery duty under Brady v. Maryland,

---

[34] Blanco filed his first motion on January 31, 1986, after his convictions and death sentence were affirmed on direct appeal. The Circuit Court denied this motion on May 6, 1986, and the Florida Supreme Court affirmed on May 7, 1987. See Blanco v. Wainwright, 507 So. 2d 1377, 1380 (Fla. 1987).

Blanco filed his second motion, which attacked his death sentence only, on August 1, 1989. The Circuit Court denied that motion as moot on April 18, 1994, the day Blanco's second penalty phase began.

The third motion, filed January 12, 1994, sought the vacatur of Blanco's convictions on the ground that newly discovered evidence established that Enrique Gonzalez and Fidel Romero committed the Ryan murder. The Circuit Court denied the motion on April 28, 1994; the Florida Supreme Court affirmed. See Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997) (concluding that the newly discovered evidence was not persuasive). (We note that the portion of the opinion affirming the April 28, 1994 order misstates the dates the second and third Rule 3.850 motions were filed. Also, the record contains two nearly identical orders from the Circuit Court denying the motion, one dated April 28, 1994, and the other dated May 5, 1994, which contains an additional sentence notifying the defendant of his right to appeal. These discrepancies are not relevant here.)

[35] Blanco described this claim in his opening appellate brief from the trial court denial of his fourth 3.850 motion: "Claim XVI addresses a particular problem that arose wherein the English speaking attorneys did not adequately convey the State's plea offer of [pre-guidelines] 'life' to [Blanco] with opportunity for parole after twenty-five years. This important claim needs to be addressed by an evidentiary hearing." Brief for Appellant at 91, Blanco v. State, 963 So. 2d 173 (Fla. 2007) (No. 85118). The Florida Supreme Court rejected Blanco's argument. Blanco v. State, 963 So. 2d 173 (Fla. 2007) (per curiam) (affirming the Circuit Court's denial of Blanco's fourth Rule 3.850 motion).

18

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and withheld material exculpatory evidence relating to Blanco's March 14, 1984, convictions for the armed robbery and armed burglary of the Emerald Hills residence. The evidence purportedly consisted of a deal the State made with Fidel Romero, to falsely implicate Blanco in the home invasion, and with Enrique Gonzalez, to keep him from giving testimony favorable to Blanco at Blanco's March 1984 trial.[36] Blanco alleged that the State used Romero's "purchased" testimony to obtain the convictions and then used the convictions to obtain a death sentence for the Ryan murder.[37]

The Circuit Court rejected both claims in an order dated July 1, 2003, denying Blanco's post-conviction motion in full. The first claim lacked merit because the court found that the State had not made the purported life sentence

---

[36] See supra note 24 (noting that Blanco was twice convicted of the armed robbery and armed burglary offenses).

[37] Blanco's motion could be read as pursuing an additional Brady claim, i.e., as a challenge to the March 14, 1984, convictions for armed robbery and armed burglary. Florida law is clear that a defendant cannot attack the validity of a prior conviction through a collateral attack in an unrelated proceeding in this manner. See Occhicone v. State, 768 So. 2d 1037, 1040 (Fla. 2000) ("[A] defendant must first collaterally challenge his prior conviction in a separate proceeding before bringing this claim."). Blanco did not challenge his 1984 Emerald Hills convictions in a prior collateral proceeding; and he would be barred from doing so now. See Fla. R. Crim. Pro. 3.850(b) (describing two-year time limitation). Any future attempt to bring such a challenge would be futile and is procedurally defaulted. See Zeigler v. Crosby, 345 F.3d 1300, 1304 (11th Cir. 2003) ("A procedural default can also arise when "the petitioner fails to raise the [federal] claim in state court and it is clear from state law that any future attempts at exhaustion would be futile.").

19

offer; moreover, as Blanco alleged in his motion, Blanco had chosen to assert his constitutional right to stand trial. The second claim lacked merit because Blanco had access to the evidence the State had allegedly withheld and any attempts to collaterally attack the validity of the March 14, 1984, convictions would be procedurally barred.

Blanco appealed the Circuit Court's July 1, 2003 decision to the Florida Supreme Court. His appeal failed. Blanco v. State, 963 So. 2d 173 (Fla. 2007) (per curiam). Addressing his claim that Moldof had rendered ineffective assistance in failing to communicate the State's offer of a life sentence with parole eligibility after twenty-five years, the court found that the record clearly established that the State had made no such offer. Id. at 179. The court found the Brady claim procedurally defaulted. Id. at 178.

C.

With the Florida Supreme Court having denied his claims, Blanco turned to the United States District Court for the Southern District of Florida for relief and, on August 31, 2007, petitioned that court for a writ of habeas corpus. His petition presented six claims for relief. Three of the claims, each challenging the constitutional validity of his death sentence, are before us in this appeal: (1) the Broward County Circuit Court denied Blanco the due process of law required under Ake when it refused to appoint the psychiatrist of his choice, Dr. Gonzales,

20

and when the psychiatrist he did appoint, Dr. Maulion, failed to provide him with competent psychiatric assistance at trial; (2) Moldof rendered ineffective assistance of counsel in failing adequately to inform him of the State's purported offer of a life sentence with parole eligibility after twenty-five years; and (3) the State committed a Brady violation by withholding material exculpatory evidence.[38]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, dictated the standards the District Court would use in resolving these issues. Under AEDPA, a federal court may not grant habeas relief on a claim adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The statutory phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). A state court decision is "contrary to"

---

[38] The three claims not involved in this appeal are that (1) Moldof rendered ineffective assistance of counsel in the guilt phase of his trial, in 1982; (2) Blanco is "actually innocent" of the Ryan murder and armed burglary; and (3) Fla. Stat. § 921.141(5)(d), establishing the felony murder aggravating circumstance, is unconstitutional on its face and as applied in Blanco's case.

21

such law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13, 120 S. Ct. at 1523. The "unreasonable application" clause of § 2254(d) permits a federal court to grant habeas relief "if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523. If the state court incorrectly applies federal law, that alone is not enough to warrant habeas relief. Instead, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)). Notably, AEDPA also establishes a presumption that the state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1). This presumption can be rebutted only by clear and convincing evidence. Id. The District Court's review of a state high court's adjudication of the merits of a claim is accordingly deferential. With these principles in hand, the District Court addressed the three claims under review.

1.

The District Court concluded that the Florida Supreme Court's adjudication

22

of Blanco's Ake claim was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent. See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON (S.D. Fla. Dec. 7, 2010). In Ake, a prosecution for capital murder, the Court held that where an indigent

> defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83, 105 S. Ct. at 1087, 1096. The right to have access to a competent mental health expert is a due process requirement that extends to the "sentencing phase" of a criminal case. Id. at 84, 105 S. Ct. at 1097.

Before both the Florida Supreme Court and the District Court, Blanco took a two-pronged approach to his Ake claim: first, Blanco argued that the trial court erred in refusing to appoint Dr. Arturo Gonzalez, his choice of psychiatrist; and second, notwithstanding the initial appointment, Dr. Maulion's performance at trial was so ineffective that it, in essence, morphed into trial court error.

The Supreme Court of Florida noted that, as an indigent defendant, while Blanco was entitled to the assistance of a competent psychiatrist, Blanco had "no 'constitutional right to choose a psychiatrist of his . . . personal liking.'" Blanco v. State, 706 So. 2d 7, 9–10 (Fla. 1997) (quoting Ake, 470 U.S. at 83, 105 S. Ct. at 1096). Thus, the supreme court concluded that the trial court properly appointed

23

Dr. Maulion, a physician who was board certified in psychiatry, neurology, addiction medicine, and pain management, and who had previously testified as an expert witness in forensic psychiatry. The Florida Supreme Court rejected Blanco's second argument as well, holding that "[t]he fact that [Dr.] Maulion's testimony did not live up to Blanco's expectations cannot in any way be categorized as a trial court error." Blanco, 706 So. 2d at 9. The District Court agreed on both counts, and rejected Blanco's argument that the Florida Supreme Court misapplied Ake. See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON, at 23 (S.D. Fla. Dec. 7, 2010).

2.

The District Court then turned to Blanco's ineffective assistance claim, that Moldof failed adequately to inform Blanco of the State's offer of a life sentence with parole eligibility after twenty-five years. The Florida Supreme Court described the ineffective assistance claim this way: "Blanco . . . argues that his second penalty phase counsel was ineffective for failing to inform him of a plea deal the State offered, and that upon Blanco's rejection of the deal the State acted vindictively in seeking the death penalty." Blanco, 963 So. at 179. The court rejected the argument as "meritless because the record clearly indicates the State never offered Blanco any plea deal." Id. The District Court found that the record was far from clear as to whether there was an offer. See Blanco v. Secretary, No.

07-61249-CIV-MARRA-JOHNSON, at 27, 30 (S.D. Fla. Dec. 7, 2010).  To the contrary, the District Court concluded that the Florida Supreme Court's decision denying the claim was based on an unreasonable determination of the facts given the evidence presented to the trial court in support of the claim.  See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON, 3–4 (S.D. Fla. Mar. 29, 2011).  The court therefore afforded the decision no AEDPA deference.  Id.

The District Court held an evidentiary hearing on the claim on February 17 and 18, 2011, to flush out the facts and to determine whether Moldof's performance satisfied the standard for effective assistance of counsel the United States Supreme Court established in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Under Strickland,

> [a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S. Ct. at 2064.

At the evidentiary hearing, the District Court received testimony from an

25

attorney who represented the State—State Attorney Michael Satz—and the attorneys who represented Blanco—Hilliard Moldof and Judith Hall.[39]  See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON, at 5 (S.D. Fla. Mar. 29, 2011).  The testimony was contradictory.  Id.  Satz testified that he never made the alleged offer; Moldof recalled the State making an offer to allow Blanco to receive a life sentence if Blanco waived his "collateral claims."  Id.  at 4.  Moldof and Hall both recalled visiting Blanco in the Broward County Jail to discuss the plea deal. A translator was not present.  Id.  at 7–8.  So, according to their testimony, Moldof and Hall attempted to explain the terms of the plea offer to Blanco in English, assuming that he might be able to understand what they said since he had understood what they said to him on earlier occasions without a translator present. Id.  They testified that they explained the State's offer, a life sentence with parole eligibility after twenty-five years.  Id.  Moldof said that, although he could not know exactly what Blanco understood, he "would have made sure in [his] mind [that he] did everything [he] could to try to make him understand it."  Id.  at 7. After Moldof explained the offer, Blanco did not ask questions or express that he did not understand.

Blanco testified that he remembered his lawyers coming to the jail to talk to

---

[39] See supra part I.A.

26

him about the State's offer.  Id.  at 8–10.  Blanco admitted that he understood at

least some of what Moldof explained.  Blanco also stated that he understood that

there were two penalty options, death and some sort of life sentence.  Moreover,

Blanco understood some complex legal terminology, including that he currently

had a 3.850 motion pending, and that he would need to waive that pending 3.850 in

exchange for the deal.  Blanco insisted, however, that had he understood the

meaning of the term parole—that he could be released after serving twenty-five

years of a life sentence—he would have accepted the State's offer.[40]  Id.

The District Court found the assertion that Blanco did not understand the

plea offer to be unpersuasive, as there were numerous instances in the record where

the two penalty options were explained, with a translator present, and where the

translator presumably translated both options for Blanco.  Id.  at 9–10.  As the

District Court observed,

> From the beginning, an interpreter was present and interpreted for Mr.
> Blanco at his arraignment on February 3, 1982.  It is true that only
> during certain portions of his original 1982 guilt and sentencing
> phases an interpreter was present in the courtroom to interpret certain
> proceedings whenever Mr. Blanco's Spanish speaking attorney was
> addressing the court.  At other times, his Spanish speaking attorney
> would simply sit next to him and translate the proceedings.  Mr.
> Blanco's testimony presumes that his Spanish speaking attorney did

---

[40]  Blanco argued before the District Court that his understanding of the State's offer,
based on his experience in Cuba, was that a life sentence meant than an individual never got out
of jail: he stated, "[I]n Cuba, once you get a life sentence it's like you die in there, you never get
out. I thought that's what the situation was."

not accurately translate the proceedings in a way that would have allowed him to understand that a life sentence was actually life in prison without the possibility of parole for twenty five years. Mr. Blanco asserts that in all the years he was a participant in proceedings in the state courts that he never heard or understood the statutory definition of a life sentence in Florida. The Court does not find this testimony to be credible.

Even if Mr. Blanco, during his initial trial and sentencing, did not understand the meaning of a life sentence without the possibility of parole for twenty-five years, the record reflects that in his post-conviction proceedings there was an interpreter present who translated the proceedings for him. The record shows that as early as August 10, 1993, (well before Mr. Blanco's resentencing and the conveyance of the plea offer) that Mr. Blanco was in the courtroom with an interpreter present when the two possible penalties under Florida law were thoroughly discussed.

Id.

The District Court also found that Moldof and Hall did not leave the jail believing that Blanco had not understood what the State was offering. Id. at 7. Rather, the court found that Blanco rejected the offer out of a desire to speak to his family before making a decision and because he consistently believed he was not guilty and did not want to do anything which would be inconsistent with that belief. Id. at 12.

The District Court accordingly concluded that Moldof's performance in conveying the State's offer was not deficient because Blanco admitted that he understood some complex legal terms, did not question Moldof about the offer, expressed legitimate reasons for rejecting the offer, had access to an interpreter

28

before resentencing, and at some point during the previous twelve years had heard the life sentence option translated into Spanish. Id. at 12–13. Blanco therefore failed to establish the first element of an ineffective assistance claim under Strickland, deficient performance. Although the court did not reach Strickland's second element, prejudice, the court noted in passing that it was not altogether clear from the evidence that Blanco would have accepted the offer given his strong belief that he was innocent. Id. at 12.

3.

The District Court dismissed Blanco's Brady claim—that the State withheld material exculpatory evidence that Blanco did not commit the armed robbery and armed burglary offenses that occurred at an Emerald Hills residence on December 29, 1981—on the ground that it lacked jurisdiction to entertain the claim.[41] See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON, at 12–13 (S.D. Fla. Dec. 7, 2010). In the court's view, the claim was a "second or successive claim," and, as such, because Blanco had not obtained an order from this court, pursuant to 28 U.S.C. § 2244(b)(3)(A), the claim could not be entertained.[42] Id. The District

---

[41] Because the District Court dismissed the Blanco's Brady claim for lack of jurisdiction, it did not consider the Florida Supreme Court's determination that Blanco had defaulted on the claim. See supra part I.B.

[42] Section 2244(b)(3)(A) states, "Before a second or successive [§ 2254] application permitted by this section is filed in the district court, the applicant shall move in the appropriate

29

Court noted that Blanco had been found guilty of the December 29, 1981 offenses ten years before the retrial of the penalty phase of his case commenced in April 1994.  Id.

> At his retrial on the robbery and burglary charges, his co-defendants [, Romero and Gonzalez,] testified as cooperating witnesses and advised the jury about the reduction of their sentences in exchange for their cooperation.  This information was known to Mr. Blanco prior to the filing in 1987 of his initial petition for writ of habeas corpus with this Court.  Therefore, when Mr. Blanco filed his initial petition for habeas corpus relief in this Court, he could have and should have made this [Brady] claim.  "The violation of constitutional rights asserted in these kinds of [Brady] claims occur, if at all, at trial or sentencing and are ripe for inclusion in a first petition."  Therefore, this claim is a second or successive habeas claim and must be dismissed.

Id. (quoting Tompkins v. Sec'y, Dept. of Corr., 557 F.3d 1257, 1258 (11th Cir. 2009).

4.

On March 29, 2011, the District Court entered a final judgment denying habeas corpus relief.  See Blanco v. Secretary, No. 07-61249-CIV-MARRA-JOHNSON, at 9–10 (S.D. Fla. Mar. 29, 2011).  Blanco timely appealed the judgment.  The District Court thereafter granted his application for a certificate of appealability ("COA") with respect to the three claims discussed in parts I.C.1, I.C.2, and I.C.3.  See Blanco v. Secretary, No.

---

court of appeals for an order authorizing the district court to consider the application."

07-61249-CIV-MARRA-JOHNSON (S.D. Fla. May 17, 2011).

## II.

In reviewing the District Court's judgment, we are in the same position as the District Court was when it considered Blanco's petition. Specifically, we ask whether the Florida Supreme Court's adjudication of the claims designated in the COA was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[43]  28 U.S.C. § 2254(d).

We turn our attention first to the claim based on Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), then shift our attention to the other claims designated in the COA.

## A.

Blanco was entitled to the appointment of a "competent psychiatrist." Ake,

---

[43]  The District Court declined to accord deference to the Florida Supreme Court's adjudication of Blanco's ineffective assistance claim—Moldof's allegedly inadequate communication of the State's life sentence offer to Blanco—and therefore decided the claim de novo based on the facts it found following an evidentiary hearing.  Accordingly, in considering that claim, we review the District Court's findings of fact under the clearly erroneous standard and the court's application of the law to those facts de novo.  See Ferguson v. Sec'y for the Dep't of Corr., 580 F.3d 1183, 1193 (11th Cir. 2009) ("When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error." (citing Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000) (per curiam))).

31

470 U.S. at 83, 105 S. Ct. at 1096. We held in Clisby v. Jones, 960 F.2d 925,

929–30 (11th Cir. 1992) (en banc), that the following analysis should be employed

when addressing Ake claims such as Blanco's:

> We first examine the information before the trial court when it is alleged to have deprived the defendant of due process. We then determine whether that information should have led the trial court to conclude that the defendant would probably not receive a fair trial. Specifically, we must assess the reasonableness of the trial [court]'s action at the time [it] took it and we are to evaluate the actions of the trial [court] based on the evidence presented to [it].

Id. at 929–30 (alterations in original) (citations omitted) (internal quotation marks

omitted).

Blanco's argument before this court, just as it was before the District Court,

was essentially two-fold: (1) that the trial court denied Blanco due process in the

initial appointment of Dr. Maulion;[44] and (2) that, even if the initial appointment

was reasonable, the trial court denied Blanco due process during the penalty trial

after it became clear that Dr. Maulion's review, preparation, and performance

testifying were incompetent.[45]

---

[44] Blanco asserts in his opening brief in this appeal that he "was denied the opportunity to obtain competent psychiatric assistance" and that the Circuit Court's "administrative order . . . allowed for the denial of funds necessary for the assistance of a competent mental health expert." Br. of Appellant at 39. In his reply brief, he states that "the mental health expert, [Dr. Maulion,] who[m] the court itself recommended and subsequently appointed, was incompetent and/or incredible." Reply Br. of Appellant at 2.

[45] Blanco states in his opening brief in this appeal: "Blanco simply desired a psychiatrist who was capable and qualified for the task at hand, which Dr. Maulion clearly wasn't,

As to his argument that the initial appointment of Dr. Maulion deprived him of due process, the Circuit Court had before it an extensive amount of information regarding Dr. Maulion's background and his potential fitness for appointment to serve as an expert.  Blanco summed up this information well in the brief he submitted to the Florida Supreme Court in appealing his sentence, Blanco v. State, 706 So. 2d 7 (Fla. 1997).  Blanco said this about Dr. Maulion:

> Dr. Maulion presented an impressive list of academic and professional credentials including a fellowship in the American Academy of Psychoanalysis, board certification in psychiatry by the American Board of Psychiatry and Neurology and the American Board of Quality Assurance and Utilization Review of Physicians and an instructor's position in psychiatry at Tulane University.  Additionally, Dr. Maulion was the president of the Broward County Psychiatric Society and a member of the council of the Florida Psychiatric Society.  Dr. Maulion was chairman of the Physician Recovery Network of the Broward County Medical Association and Chief of Staff of the medical Executive Committee at the Retreat Hospital. The doctor also was a member of the Bioethics Committee at Broward General Hospital and the founder of a charitable foundation.  Dr. Maulion previously worked in two Veteran's Administration Hospitals and at the Charity Hospital in New York.  At the time of his testimony, Dr. Maulion maintained a psychiatric practice where he saw both outpatients and inpatients.  The psychiatrist was offered, and accepted by the prosecution with no objection, as an expert in psychiatry.

Brief for Appellant at 22, Blanco v. State, 706 So. 2d 7 (Fla. 1997) (No. 85118)

---

notwithstanding counsel's initial impressions to the contrary.  Because of the state court's actions, Blanco was denied meaningful access to expert assistance as well as a 'fair opportunity to present his defense.'" Br. of Appellant at 40.

33

(citations omitted).  As if the Circuit Court's appointment of Dr. Maulion did not satisfy Ake's due process requirement of the provision of competent psychiatric assistance, the Florida Supreme Court noted that "in addition to appointing Dr. Maulion, the court appointed, at county expense, a psychologist, a neuropsychologist, a neurologist, and a sociologist to assist in Blanco's defense." Blanco, 706 So. 2d at 10.  In short, we need not hesitate to conclude that the trial judge acted reasonably in making the initial appointments of Dr. Maulion as well as the other experts who assisted him, and in doing so, the court clearly satisfied Ake's due process requirement.

That may be well and good, Blanco says, but Dr. Maulion's trial performance—his testimony—was ineffective, and this shortcoming rendered the sentencing phase of the trial fundamentally unfair.  Put another way, Blanco argues that, while Dr. Maulion appeared competent on paper at the time of his appointment, his incompetence did not become apparent until he testified at trial. In advancing this argument, however, Blanco overlooks the fundamental proposition that the denial of due process in the Ake sense must be due to trial court error: it must be the trial judge, not the mental health expert, who denies the defendant due process by taking some action that renders the proceeding fundamentally unfair.  See Conklin v. Schofield, 366 F.3d 1191, 1206 (11th Cir.

34

2004).  As we instructed in Clisby, 960 F.2d at 928–29, 934 and later in

Provenzano v. Singletary, 148 F.3d 1327, 1333–34 (11th Cir. 1998),[46] the

defendant must point to an error of the trial court that deprived him of due process

of law to make out an Ake claim.  In this case, however, Blanco fails to expressly

tell us when or how the trial judge denied him due process during resentencing.

If Moldof thought that Dr. Maulion's testimony rendered the second penalty

phase of the case fundamentally unfair, he should have asked the trial judge to

bring the sentencing hearing of January 6, 1995 to a halt and grant Blanco a new

penalty phase proceeding before the jury on the ground that the court had failed to

provide him with competent psychiatric assistance.  Or Moldof could have waited

until after the court imposed a death sentence and moved the court, within ten days,

pursuant to Florida Rule of Criminal Procedure 3.590, to vacate the jury's verdict

and grant Blanco a new penalty-phase.[47]  Had Moldof pursued either course and

_____

[46]  The court in Provenzano commented, "Clisby holds that Ake is a due process doctrine,
which requires the petitioner in all but the most unusual circumstances to show that he requested
from the trial court something in the way of mental health expert assistance that the trial court
refused to give him." Provenzano v. Singletary, 148 F.3d 1327, 1333–34 (11th Cir. 1998)
(citation omitted))

[47]  Rule 3.590(b), states, in pertinent part:

(b) Time for Filing in Capital Cases Where the Death Penalty Is an Issue. A
motion for new trial or arrest of judgment, or both, or for a new penalty phase
hearing may be made within ten days after written final judgment of conviction
and sentence of life imprisonment or death is filed. The motion may address
grounds which arose in the guilt phase and the penalty phase of the trial. Separate

35

the court denied his motion, he could have contended on appeal that the court had erred and that the error amounted to a denial of due process because it rendered the sentencing proceeding fundamentally unfair.  Instead, he chose neither course.

Blanco apparently believes that Moldof's colloquy with the trial judge on January 6, 1995—the day the judge imposed the sentence and eight months after the jury made its sentencing recommendation—somehow obligated the judge to intervene, and that the judge's failure to intervene rendered the second penalty phase fundamentally unfair.  The subject of the colloquy was Dr. Maulion's performance before the jury.   Moldof said that "[Dr. Maulion] was really not a forceful witness for the defense."  But, in nearly his next statement, he confessed that he did not raise the issue before the court any earlier because, "quite frankly, I guess . . . if that's my fault, then it's my fault.  One of the problems is . . . psychiatry is as much an art as a science to me."[48]  Moreover, it is beyond dispute that, even after this colloquy, Moldof still never asked the trial judge to take any particular action.

---

motions for the guilt phase and the penalty phase may be filed. The motion or motions may be amended without leave of court prior to the expiration of the ten day period, and in the discretion of the court, at any other time before the motion is determined.

Fla. R. Crim. P. 3.590(b).

[48]  See supra part I.A.3.

36

Even putting aside Blanco's failure to identify any error to the trial court, the Florida Supreme Court continued that "[t]he fact that Maulion's testimony did not live up to Blanco's expectations cannot in any way be categorized as trial court error." Blanco, 706 So. 2d at 9.  We agree.[49]  Though Dr. Maulion did not overwhelm, nor necessarily persuade, the jury or trial judge, Dr. Maulion did testify favorably to Blanco, opining that based on his in-person evaluation of Blanco, review of documents provided by other experts, and study of preparation materials, two statutory mitigating circumstances were present.[50]  That Moldof was not pleased with Dr. Maulion's performance on cross-examination did not, standing alone, render Dr. Maulion incompetent.[51]  And, what's more, that Moldof chose to follow up Dr. Maulion's favorable opinion testimony with Dr. Bukstel's less favorable opinion—that, contrary to Dr. Maulion's view, only one-half of one

---

[49]  At least one other circuit also agrees with this proposition.  See Parker v. Norris, 64 F.3d 1178, 1185 (8th Cir. 1995) ("[E]ven if the prosecutor ultimately cross examined [an expert] more effectively than standby counsel cross examined [an expert], that does not establish that the trial court previously deprived [the defendant] of constitutionally-mandated psychiatric assistance.").

[50]  Although Dr. Maulion's preparation included a one-hour meeting with Blanco and focused mainly on review of other records, we found such performance adequate in Clisby. Clisby v. Jones, 960 F.2d 925, 931, 932 (11th Cir. 1992) (en banc) (noting that the psychiatrist examined the defendant for mitigating factors for only forty-five minutes to one hour).

[51]  The State effectively cross-examined Dr. Maulion on several key portions of his testimony.  For example, Dr. Maulion could not identify Blanco in the courtroom, failed to recall the names of witnesses, and could not remember the specific results of Dr. Bukstel's testing that supported his diagnosis.

37

statutory mitigator applied—hardly supports the claim that Dr. Maulion was ineffective.[52]

In sum, Blanco's claim, albeit implicitly, is that the trial judge, acting on its own initiative, should have granted Blanco a new penalty phase trial on the ground that Dr. Maulion's performance before the jury rendered the jury proceeding fundamentally unfair. There is nothing in United States Supreme Court precedent that would support such a claim such as the one Blanco raises before us. As a result, the trial court did not act contrary to clearly established Federal law, and its decision was not based on an unreasonable determination of the facts in light of the evidence presented. The District Court's denial of Blanco's Ake claim is accordingly affirmed.

## B.

We move now to the claim that Moldof rendered ineffective assistance in failing adequately to inform Blanco before the new penalty phase of his case began that the State had offered him a life sentence, with parole eligibility after twenty-five years. The new penalty phase of Blanco's case began on Monday, April 18, 1994. Blanco claims that on Thursday or Friday of the previous week, State Attorney Satz informed Moldof that the State would abandon its pursuit of a death

---

[52] For a summary of their testimony, see supra part I.A.2.

sentence if Blanco abandoned his Rule 3.850 challenge to his convictions, which was then pending in the Broward County Circuit Court.[53]  If Blanco accepted the offer, the Circuit Court would sentence him to prison for life, subject to his right to apply for parole after serving twenty-five years of the sentence.[54]  Blanco says that Moldof informed him that Satz offered a life sentence, but failed to explain that he would potentially be able to get out after twenty-five years.  Blanco asserts that, had Moldof told him about the possibility that he could be paroled, there is a reasonable probability that he would have accepted the offer.  Given these facts, Blanco contends that he made out a claim of ineffective assistance of counsel under Strickland.  See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984) (holding that, in order to prevail, a party must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense).

In examining the record, the Florida Supreme Court found no evidence of the offer Blanco has described.  The District Court, however, concluded that the record was not clear on the point and therefore scheduled an evidentiary hearing to

_____

[53]  Moldof testified before the District Court that he went to see Blanco at the Broward County Jail the previous week: "My best recollection, Your Honor, is I went to see Mr. Blanco, I want to say right before the hearing began.  I think it was either, you know, maybe like the Thursday [April 14, 1994] or Friday [April 15, 1994] before."

[54]  Florida law would require the court to impose such sentence.  See supra note 9.

39

resolve the issue.  And, as indicated in part I.C.2, supra, based on the testimony

adduced at the hearing, the District Court then found that the alleged offer had

been made;[55] that Blanco, despite his testimony to the contrary, knew that the offer

was for a life sentence subject to parole eligibility after twenty-five years; and that

Blanco deliberately rejected the offer, opting instead to present his case to the jury.

Blanco challenges these findings of fact as clearly erroneous, arguing that

the District Court should have accepted his testimony and granted the writ.  We are

not persuaded.  To explain why, we begin with the events that took place between

the issuance of the mandate in Blanco v. Singletary, 943 F.2d 1477 (11th Cir.

1991), on May 29, 1992, following the United States Supreme Court's denial of

certiorari review,[56] and the impanelment of the sentencing-phase jury on April 18,

1994.  We then explain why the District Court's factual findings are not clearly

erroneous.

1.

a.

The May 29, 1992, mandate required that the retrial of the sentencing phase

---

[55] Like the District Court, we also conclude that we need not determine whether there was a firm offer because the claim fails on other grounds; we assume in this opinion that an offer was made.  We also do not decide if the District Court correctly required a federal evidentiary hearing on whether a plea offer, in fact, was made by the State.

[56] See supra note 12.

begin within thirty days.  To satisfy that requirement, the Circuit Court set the case

for trial before a jury on June 22.  On June 12, the court held a status conference.

Blanco, who had been returned to the Broward County Jail for the retrial, appeared

before the court.  The court informed Blanco that the sentencing phase of his case

would begin on June 22, and asked him if he wanted the court to appoint counsel.

Blanco said that he did, and, after a brief interlude, the court appointed Moldof.

Because Moldof could not possibly be ready for trial on June 22, and because

Blanco consented to a continuance, the court continued the trial, eventually

scheduling it to begin on April 18, 1994.  Blanco remained in the Broward County

Jail all the while.

One of Blanco's cell mates at the jail was Eduardo Chong, who had been

sentenced to a seventeen-year prison term for armed kidnaping.  On March 3,

1993, the State Attorney's office received a letter from Chong, who was then

housed at the South Florida Reception Center in Dade County.  Chong wrote:

> Mr. Blanco has confided in me of the murder he committed, and I
> would like to be of some assistance in court & testify against Omar.
> He confessed to me that he did actually commit the murder and also
> where he placed the murder weapon which he killed him.  He also told
> me . . . [that] he had a conversation with Roberto Alonso that lasted
> about forth-five minutes.  And the nature of this conversation was
> basically that Mr. Alonso testifies in [sic] Mr. Blanco's behalf and
> give a false testimony [sic], that Alonso's brother which is dead [sic],
> did the actual killing with this other guy that got deported back to
> Cuba, and in return if Blanco wins the case, he has promised them

41

money from the millions of dollars he plans to get from his sue [sic] against the State.  This false witness [sic] and Mr. Blanco keep in touch through letter [sic] that they send to Blanco wife, as the mutual agreement to which they have arrived [sic] along with some stories to back his false testimony.  If in anyway I'm able to be some assistance [sic], please give me a response at South Florida Reception Center.

On May 7, 1993, the State, anticipating that Blanco would contend before the jury that someone else committed the Ryan murder, moved the Circuit Court in limine to bar Blanco from doing that.  In Blanco's response to the motion filed on July 26, 1993, Moldof moved the court

> to allow the Defendant the opportunity to rebut the [anticipated State testimony] that the Defendant committed the crime, . . . and as grounds therefore . . .  allege[d]:
>
> 1.  That the Defendant OMAR BLANCO, was convicted of Murder in the First Degree and Burglary while Armed on June 11, 1982.
>
> 2.  That the State of Florida is currently pursuing the imposition of the death penalty[.]
>
> 3.  That the Defendant has located a witness, Roberto Alonso, who has testified he was present immediately after the killing, and the Defendant was not one of the individuals involved in the killing.  Roberto Alonso is the brother of the participants in the killing[.]
>
> . . . .
>
> 10.  That the State must prove an aggravating circumstance, beyond and to the exclusion of every reasonable doubt.
>
> 11.  That the Defendant has an absolute right to rebut the

42

testimony put forth by the State to interject a reasonable doubt.

The Circuit Court heard the State's motion in limine on August 10, 1993. At the conclusion of the hearing, the court ruled from the bench that Florida case law permitted the State to present evidence of the murder, "so that the jury does not have to make an advisory sentence in a vacuum," and that Blanco would be precluded from introducing "evidence as to lingering doubt or residual doubt."

b.

On January 12, 1994, Blanco moved the Circuit Court pursuant to Rule 3.850 for "An Evidentiary Hearing on Newly Discovered Evidence."[57] In the motion, Moldof represented that the "newly discovered evidence, which could not have been discovered by reasonable diligence at the time of the trial, suggest[ed] that the Defendant was not the individual that was responsible for the homicide" and that his convictions should be vacated and a new trial ordered. Moldof represented the following:

> 3. That after undertaking the representation of Mr. Blanco for re-sentencing, [Moldof] was put in contact with Roberto Alonso as an individual who had pertinent information regarding the shooting[.]
>
> 4. That upon the [Moldof]'s speaking with Roberto Alonso, while Mr. Alonso has been incarcerated [in] Collier Correctional Institution, it was the substance of Mr. Alonso's testimony that he was present in

_____

[57] This was the third motion for Rule 3.850 relief Blanco submitted to the Circuit Court.

43

the home of his brother, Ray Alonso, when Ray Alonso, Fidel Romero and Enrique Gonzalez returned from the burglary that resulted in the homicide of the victim[.]

5.  That through due diligence and all other avenues of discovery, there was no method for the defense to have discovered this evidence at the time of the original trial.  Mr. Blanco came in contact with Roberto Alonso after his incarceration for his conviction for Murder in the First Degree while in a facility where Roberto Alonso was being held.  At that time, Roberto Alonso recognized Mr. Blanco and discussed the facts with Mr. Blanco indicating that he possessed information that tended to negate the guilt of Mr. Blanco.

6.  That Mr. Blanco, after been returned to the Broward County Courthouse for re-sentencing, told the undersigned this information, at which time [Moldof] located Roberto Alonso and went to Mr. Alonso to question him with regard to these facts.  Both the State and defense were present at the initial questioning of Mr. Alonso, and [Moldof] never spoke to Mr. Alonso before hand.  At that time, Mr. Alonso made a statement that he was in possession of information that revealed that Mr. Blanco was not the individual who committed the killing of the victim[.]

7.  That by reason of this new information, the Defendant would desire to present this information to the jury considering the sentence of the Defendant where this newly discovered evidence tends to negate the guilt of the Defendant.

Following these recitals, Moldof requested that the Circuit Court reconsider its August 10, 1993, ruling barring Blanco from presenting the jury with the lingering doubt evidence he proffered in Blanco's response to the State's motion in limine.  Moldof reminded the court that it had made the ruling without the benefit of an evidentiary hearing.  He therefore "request[ed] an evidentiary hearing to

44

determine if the Defendant will be allowed to present any evidence of his non-involvement in the events which led to the death" of John Ryan, i.e., "newly discovered evidence, which could not have been discovered by reasonable diligence at the time of the [1982] trial suggesting that the Defendant was not the individual that was responsible for the homicide."

In sum, Blanco was pursuing two objectives. First, he wanted the Circuit Court to vacate his murder and armed burglary convictions and to grant a new trial. Second, absent a new trial, he wanted an opportunity to establish his innocence before the jury in the second penalty phase of the case.

On February 25, 1994, the Circuit Court held the evidentiary hearing Blanco requested. Moldof called two witnesses to establish Blanco's innocence of the Ryan murder, Roberto Alonso and Carmen Congora, the wife of Alonso's brother, Ray Alonso. Congora testified that, on the night of the Ryan murder, she was at home with Roberto Alonso, who was visiting, when Enrique Gonzalez arrived with her husband, Ray. Gonzalez was wearing a pullover. It was covered with blood, so he took it off. Ray Alonso asked Gonzalez why he "went after the guy with a gun." Gonzalez replied that "he didn't want to go after [the victim] but the guy came and the gun went off a lot of times."

Roberto Alonso testified that Gonzalez was armed and "had a bunch of

45

blood on the left side of his shirt.  That's why he took his clothes off and my

brother took it and put it in [the] garbage[.]"

In addition to the testimony of these two witnesses, Blanco presented the

court with a statement from his mother, Zenaida Blanco, who was in Cuba.  She

wrote that she had spoken to a woman, Maria Del Carmen Guerra, who said that

her son, Julio Guerra, was in prison with Gonzalez (in Cuba) and that Gonzalez

confessed to Julio that he committed the Ryan murder.  Blanco then presented

letters from Maria Del Carmen Guerra and Julio Guerra.  In his letter, Julio Guerra

wrote that he had heard the confession directly from Gonzalez.

The State vigorously cross-examined Congora and Roberto Alonso.[58]  Satz

got Congora to acknowledge that in the statement she had given the State

Attorney's office in April 1982, she failed to mention the night-of-the-murder

event she described on direct examination.  Satz also established inconsistencies

between her testimony on direct examination and sworn statements she had given

the State Attorney's office in February 1993 and made in a July 1993 deposition

taken by Moldof.  The inconsistencies included, for example: (1) on direct

examination, she said that Gonzalez's pullover was covered in blood, while in

---

[58] On cross-examination, Congora admitted that she had mental health issues and was easily confused.

46

earlier statements Congora had said that <u>both</u> Fidel Romero and Enrique Gonzalez arrived at her house with clothing covered in blood; and (2) on direct examination, she denied ever seeing Blanco with blood on his clothing, whereas in earlier statements she said that she had seen Blanco with blood on his clothing on two occasions. Similarly, cross-examination revealed an inconsistency between Congora's testimony and Alonso's testimony. On direct examination and in her earlier sworn statements, Congora said that at the time of the murder she was living with her husband, Ray, and three unnamed people, and that Roberto Alonso just happened to be visiting her when Gonzalez and her husband arrived the night of the Ryan murder. Roberto testified, on direct examination, that at the time of the murder, he was not visiting Congora; he was living with her and her husband because he had just gotten out of jail and needed a place to stay.[59]

After Moldof completed his presentation, Satz called three witnesses to the stand, Eduardo Chong, Carlos Ruiz, and Jorge Gonzalez.[60] All three had been incarcerated with Blanco. Chong repeated what he had written in his March 3, 1993 letter to the State Attorney—that Blanco admitted to committing the murder

---

[59] On cross-examination, Alonso admitted that he had been convicted of murder, arson, armed burglary, and grand theft.

[60] The State also presented a summary of the evidence on which the jury found Blanco guilty in 1982 in a memorandum.

and was involved with fabricating the story that Gonzalez was the real killer.
Chong admitted on cross-examination that he had three or four prior convictions,
that he was currently incarcerated, that he had reached out to the State, and that he
might benefit from his testimony against Blanco. Ruiz testified that while Blanco
at first claimed he was innocent, Blanco later admitted that he was present during
the robbery at the Vezos's residence and that "things went bad." Ruiz said that
Blanco did not admit, though, that he was the one who shot the victim. Ruiz also
testified that he was present when Blanco asked Jorge Gonzalez to give false
testimony to discredit Chong. Gonzalez confirmed that Blanco asked him to give
false testimony in order to discredit Chong. At the end of the State's presentation,
Satz argued that Blanco's newly discovered evidence was insufficient to create any
doubt about Blanco's guilt and did not warrant a new trial.

The Circuit Court reserved ruling on Blanco's motion until April 28, 1994,
while the second penalty phase before the jury was underway. In an order filed
that day, the court denied the motion, finding the testimony of Congora and Alonso
not credible and totally refuted by the testimony and physical evidence introduced
at trial in 1982. In short, if afforded a new trial, Blanco would be found guilty as
before.[61]

_____

[61] In reaching its decision, the court found that "the letters from Cuba stating that
Enrique Gonzalez confessed to the murder of John Ryan would not be admissible in a retrial of

48

c.

The District Court also had before it facts that further illustrated Blanco's strong belief in his own innocence from the Rule 3.850 motion he presented to the Circuit Court on September 16, 1999, and from statements he made in various briefs he filed before the Florida Supreme Court.

We start with the facts stated in the Rule 3.850 motion Blanco filed on September 16, 1999. The State's offer of a life sentence with parole eligibility appears in two of the claims Blanco's motion presented, Claims XV and XVI. Claim XV, Violation of the Sixth Amendment, alleges the following:

> 120.   After completing its extensive investigations and preparations for the second penalty phase and just preceding the commencement of that phase of trial, the state offered a life sentence plea bargain. Counsel begged the defendant to accept the offer [although he never communicated that it would be mandatory life as opposed to possibility of parole after 25 years] but OMAR BLANCO refused maintaining as he had testified at [his 1982] trial that he did not kill JOHN RYAN.
>
> 121.   The defendant chose to assert his constitutional right to a jury recommendation of penalty and the case proceeded to the jury. Following that second penalty phase, the jury recommended death with a greater margin than the original jury that heard the guilt phase

---

Mr. Blanco." Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997). The court found, alternatively, that assuming the letters' admissibility, "there is no probability that [the retrial] would result in an acquittal . . . , considering all of the testimony at the trial and the testimony of Thalia Vezos at the 3.850 hearing that Enrique Gonzalez . . . was not the person who committed the crime." Id.

trial. Then the state sought the death penalty at sentencing with great vigor. The facts as they stood before the jury's recommendation were the same as the facts proven at the trial. Both sides had every indication of what proof would be forthcoming at the second penalty phase proceeding. There is no fair and reasoned explanation for the change in the state's position on the death penalty being inappropriate in this case from just before and just following the verdict other than vindictiveness against the defendant for asserting his constitutional right to trial.

122. In similar fashion, the trial court was fully informed by the state (upon the known facts and evidence which would be proved at the second penalty phase if the parties proceeded) that the appropriate penalty for conviction of first-degree murder in this particular case would be a life sentence and not the death penalty. The trial court proceeded to sentence defendant to death. There is no fair and reasoned explanation for the change in the trial court's position on the death penalty being inappropriate in this case from just before the second penalty phase and then becoming appropriate just following the verdict, other than vindictiveness against the defendant for asserting his constitutional right to trial.

123. The effect of the actions by the state and the trial court, taken together, was to place a chilling effect on defendants asserting their fundamental right to jury trial and to punish those defendants who chose to assert their right to trial.

(Emphasis added).

Claim XVI, Ineffective Assistance of Counsel, alleges the following:

124. After completing its extensive investigations and preparations for the second penalty phase and just preceding the commencement of that phase of trial, the state offered a life sentence plea bargain.

125. The offer of a life sentence in a charge committed under the law as it stood in 1982 would mean a life-sentence with the possibility of parole after 25 years. It would further have taken the defendant off

50

death row and placed him [in] general population for the remainder thereto [i.e., no mandatory orange uniform depicting death sentence; no mandatory hand and foot restraints, etc.].

126.  Defendant does not understand the American judicial system and in Cuba a life sentence means a person will die in prison with no chance to be paroled ever[.]

127.  Defendant was shocked to learn that his attorneys did not properly communicate the actual offer to him in 1994.  He simply had no understanding of the offer that was made.  Hence he could not knowingly and understandably reject it.  Had he known that he could have possibly been paroled after 25 years and deported back to Cuba he very well may have explored that opportunity for such a resolution of his litigation.

128.  Counsel had the duty to communicate adequately to their client any plea offers that were rendered in his litigation.  Both counsel failed to effectively communicate the offer in terms that he was able to understand and make a reasoned decision upon.  The failure to communicate the offers constitutes ineffective assistance and the defendant should not be forced to face the death penalty unless and until he considers the offer of 'life' and can make an intelligent decision on said offer.  Interpreters must be made available to this defendant so that he can fully consider the offer.

(Emphasis added).

Read together, these claims allege that before the jury was impaneled to begin the second penalty phase of Blanco's trial (1) both parties were aware of the evidence that would be put to the jury; (2) the evidence would establish the same facts established at the 1982 trial; (3) the State's position was that, based on those facts, a death sentence would be "inappropriate"; (4) the trial judge had been fully

51

informed of such facts and, like the State, agreed that a death sentence would be inappropriate; (5) Blanco rejected the State's offer of a life sentence plea bargain and chose to go to trial because, as he testified at his 1982 trial, he did not kill John Ryan; (6) the State and trial judge changed their positions as to the appropriateness of a death sentence; and (7) the State urged the judge to impose a death sentence and the judge imposed it to punish Blanco for exercising his constitutional right to take his case to the jury.

In addition to these protestations of innocence, the record before the District Court contained additional support for Blanco's position that he was actually innocent, including statements made in both (1) the brief Blanco submitted to the Florida Supreme Court in Blanco v. State, 702 So. 2d 1250 (Fla. 1997), his appeal from the Circuit Court's denial of his January 6, 1994, Rule 3.850 motion;[62] and (2) the brief he submitted to the Florida Supreme Court in appealing the death sentence he received on retrial, in Blanco v. State, 706 So. 2d 7 (Fla. 1997).[63]

---

[62] In its opinion affirming the Circuit Court's denial of Rule 3.850 relief, the Supreme Court cited Blanco's claim of innocence with these words: "During the pendency of the resentencing proceeding, Blanco filed [a] rule 3.850 motion, seeking to present newly discovered evidence. The trial court held an evidentiary hearing on February 24, 1994, and Blanco advanced the theory that another man, Enrique Gonzalez, was the killer." Blanco v. State, 702 So. 2d at 1251.

[63] Blanco's brief, in arguing that the death sentence was not warranted, affixed the following footnote to his statement that the application of the death sentence is reserved for the "most aggravated" and "most indefensible of crimes." Brief for Appellant at 56, Blanco v. State, 706 So. 2d 7 (Fla. 1997) (No. 85118) (citations omitted). The footnote is to the effect that Blanco

52

2.

In fine, we conclude that Blanco failed to establish either Strickland prong and is therefore not entitled to relief. Blanco's counsel was not ineffective in the conveyance of the plea offer because the record is replete with evidence that Blanco understood that a life sentence meant life with an opportunity to get out of jail (parole eligibility after twenty-five years) and, thus, that Blanco knew what the State allegedly offered in the plea deal. See Chandler v. United States, 218 F.3d 1305, 1313, 1315 (11th Cir. 2000) (en banc) (holding that the ineffectiveness prong of Strickland is a high bar, requiring a showing that "no competent counsel would have taken [the action in question]"). For example, in a hearing before the trial court on August 10, 1993—well before the date of the alleged plea offer—the following was said at a pre-resentencing hearing in the presence of both Mike Buch, a Spanish interpreter from the Court Administrator's Office, and Blanco:

[MR. MOLDOF: Arguing that the trial court should grant Blanco's

---

chose to take his case to the jury, where, presumably, he could demonstrate his innocence.

As in another case reduced on proportionality grounds, the pre-penalty phase life plea offer if Omar Blanco would withdraw his newly discovered evidence claim, shows that "the state itself originally concluded that the crime did not warrant imposition of the death penalty and agreed to a plea bargain of life imprisonment until [the defendant] himself insisted otherwise." Elam v. State, 636 So. 2d 1312, 1315 (Fla. 1994).

Brief for Appellant at 56, fn. 8, Blanco v. State, 706 So. 2d 7 (Fla. 1997) (No. 85118) (citations omitted).

53

motion in limine to prevent the State from being able to suggest to the jury that Blanco might be paroled some day].

MR. SATZ: My response is, Your Honor, that you're going to instruct them that there's two penalties they can consider, life with twenty-five years before he is eligible for parole is one of them.  That's the law, so I can argue that.  The Court's going to tell them they're eligible for parole after twenty-five years.

. . . .

MR. MOLDOF: So, I read [the case law to say that] at no time can [the State] argue to the jury that the possibility he's going to get parole someday is the reason you should put him in the death chair.  Again, the logic has to be in every death penalty case death is the right sentence, the only other one they can give you is life with a parole date.  The State would then be able to argue in every case we automatically should sentence him to death because the alternative is [Blanco] is going to be able to get out one day[.]

You can't make that argument where it's a—you're using it to get back to where every case deserves the death penalty because that would be the case.  If you look at the other penalty, he's going to have to be paroled one day.

MR. SATZ:  I'm not going to argue sentence this person to death because he will be paroled.  There's a big difference.  There's two penalties you can consider, death or life in prison for twenty-five years before eligible for parole.

I'm not going to say electrocute this man because he can be paroled some day.

(Emphasis added).

As indicated in the hearing quoted above, Blanco was present, along with a translator, when Satz and Moldof discussed that there were two penalties possible: death or life with parole after twenty-five years.  If the death penalty was not

54

imposed, Moldof described the life sentence "alternative" to mean that "[Blanco] is going to be able to get out one day." Thus, the record makes clear that Blanco had heard that the only other option available meant that he could get out of prison someday; Blanco may or may not have understood the term "parole" but he certainly had been told that the non-death option meant he could potentially get out of prison after twenty-five years. Because Blanco admitted he understood some complex legal terms; did not question Moldof about the offer; expressed other legitimate reasons for rejecting the offer; had access to an interpreter before resentencing; and, as indicated, had heard the non-death penalty option at some point during the previous twelve years, including the term "parole," translated to mean that he could get out of jail, the District Court's findings that Blanco sufficiently understood the plea offer were not clearly erroneous. Similarly, the District Court did not err in reaching its conclusion that Moldof's performance was not deficient in his conveyance of the plea offer.

In addition to failing to demonstrate deficient performance on Moldof's part, Blanco failed to show prejudice. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Acceptance of the State's life sentence offer would have required Blanco to abandon his position that Enrique Gonzalez committed the murder and admit that he, instead, was the culprit. The District Court found that Blanco did not want to

admit to the killing because he steadfastly believed that he was innocent and that

Enrique Gonzales actually committed the murder.  The court was aware that

Blanco consistently claimed that he was innocent of the crime, as is evidenced by

the fact that he protested his innocence during his 1982 trial; in his July 26, 1993,

response to the State's motion in limine; at the hearing the court held on that

motion on August 10, 1993; in prosecuting the Rule 3.850 motion he filed on

January 12, 1994; in the Rule 3.850 motion he filed on September 16, 1999; in

briefs he submitted to the Florida Supreme Court; in the District Court; and in this

court.  The District Court did not clearly err in finding that Blanco's belief in his

innocence motivated his rejection of the offer and, likewise, the District Court

correctly determined that Blanco could not show prejudice as a result of the

rejection on this basis.

In sum, given the record before the District Court, we reject Blanco's

Strickland claim.

C.

Blanco's final claim, based on the Supreme Court's decision in Brady v.

Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),[64] is that in the

---

[64] Blanco asserts this claim under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  In a criminal prosecution under state law, the claim lies under the Due Process Clause of the Fourteenth Amendment.  Brady, 373 U.S. at 87, 83 S. Ct. at 1196–97.

56

time period immediately preceding his resentencing (1992 to 1994), the State withheld material, exculpatory evidence relating to his March 14, 1984, convictions for the armed robbery and armed burglary of an Emerald Hills residence on December 29, 1981, and thereby denied him due process of law in the second penalty phase of his case. A Brady claim arises when the prosecutors fail to disclose evidence material to the prosecution, even when "there has been no request by the accused." Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999) (citing United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399, 49 L. Ed. 2d 342 (1976). To establish a Brady violation, a defendant must show three elements: (1) that the evidence at issue is favorable to the accused; (2) that the State suppressed the evidence, either willfully or inadvertently; and (3) that the evidence is material to the guilt or punishment of the defendant such that the defendant suffered prejudice as a result. See Strickler, 527 U.S. at 281–82, 119 S. Ct. at 1948.

Blanco raised this claim for the first time in his fourth Rule 3.850 motion, the amended version of which was filed on May, 29, 2001. The Circuit Court rejected this claim, reasoning that no information was withheld and that, even if it was not affirmatively disclosed, Blanco had equal access to the information contained in court records. The trial court also incorporated from the State's brief

additional reasoning that the claim was procedurally barred if Blanco was attempting to challenge the validity of the March 14, 1984, convictions. On appeal, the Florida Supreme Court affirmed, addressing the claim as if it challenged only the validity of those convictions and therefore finding it to be procedurally barred. Blanco v. State, 963 So. 2d 173, 178 (Fla. 2007) (stating that the claim "that the State unlawfully procured the absence of Enrique Gonzalez and Fidel Romero, whom Blanco claims are the actual murderers," could have been brought in prior Rule 3.850 proceeding). The District Court, on habeas review, declared the claim "second or successive" and dismissed it because Blanco had not obtained authorization to file it pursuant to 28 U.S.C. § 2244(b)(3)(A).[65] As we explain, the claim is neither successive nor procedurally defaulted; we therefore consider it on the merits.

1.

This is not a second or successive petition given the Supreme Court's recent holding in Magwood v. Patterson, — U.S. —, 130 S. Ct. 2788, 177 L. Ed. 2d 592 (2010). In Magwood, as in Blanco's case, a writ of habeas corpus was issued pursuant to 28 U.S.C. § 2254 vacating the petitioner's death sentence. Id. at —, 130 S. Ct. at 2791. A new sentencing hearing was held, and the petitioner was

---

[65] See supra note 42.

58

again sentenced to death. Id. He appealed the new sentence under § 2254, arguing that the conviction was improperly based on an aggravating factor, even though this factor had been relied upon to support his original sentence and the defendant had not raised this argument in his § 2254 attack on his original sentence.[66] Id. at —, 130 S. Ct. at 2792, 2794. The United States District Court for the Middle District of Alabama rejected the State's argument that the petition was successive and issued the writ, thereby vacating the petitioner's sentence. Id. at —, 130 S. Ct. at 2794–95. We reversed. Magwood v. Culliver, 555 F.3d 968, 976 (11th Cir. 2009). We held that, because the petitioner could have included the argument at issue in his § 2254 attack on his first death sentence, he was precluded by 28 U.S.C. § 2244(b) from asserting it in his § 2254 attack on his second death sentence.[67] Id. The Supreme Court reversed. Magwood, — U.S. at —, 130 S. Ct.

---

[66] The aggravating factor in Magwood v. Patterson was that the defendant murdered a sheriff while on duty or because of some official act performed by the sheriff. See Magwood v. Patterson, — U.S. —, 130 S. Ct. 2788, 177 L. Ed. 2d 592 (2010) (citing Alabama Code § 13–11–2(a)(5) in support of its conclusion that, while there was no statutory aggravating circumstance applicable, prior Alabama case law allowed the court to find a sufficient aggravating factor to support the death penalty when the defendant committed the crime of "murder of any . . . sheriff . . . while . . . on duty or because of some official or job-related act.").

[67] 28 U.S.C. § 2254(b) states, in pertinent part:

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed. (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless -
        (A) the applicant shows that the claim relies on a new rule of

at 2803. It held that the first § 2254 application the petitioner filed challenging his

new sentence was not a "second or successive" petition barred by 28 U.S.C. §

2244(b). Id. This was so even though the petitioner could have presented the

precise argument he was using to attack his new sentence in his first § 2254

petition. Id. at —, 130 S. Ct. at 2792, 2801. As the Court explained,

> This is Magwood's first application challenging that intervening judgment. The errors he alleges are new. It is obvious to us—and the State does not dispute—that his claim of ineffective assistance at resentencing turns upon new errors. But, according to the State, his [claim] does not, because the state court made the same mistake before. We disagree. An error made a second time is still a new error. That is especially clear here, where the state court conducted a full resentencing and reviewed the aggravating evidence afresh.

Id. at —, 130 S. Ct. at 2801 (emphasis in original).

This describes the situation we face here. The factual predicate for Blanco's

Brady claim was available when he filed the § 2254 petition attacking his first

death sentence. But with respect to the judgment before us, the "intervening

judgment," the Brady claim is new. The District Court therefore erred in

dismissing the claim as second or successive.

---

> constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)
>> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence[.]

60

2.

As noted above, the Florida Supreme Court treated Blanco's Brady claim as an attack on his March 14, 1984, convictions for armed robbery and armed burglary and held the claim procedurally barred. That the court did so is understandable; Blanco's May 29, 2001, Rule 3.850 motion alleged that he did not commit those crimes and the court reasonably concluded that the motion sought the vacatur of those convictions and a new trial. We read the motion as the Florida Supreme Court read it, but we also believe that it alleged that the Brady material the State withheld in 1992 to 1994 rendered the second penalty phase of his trial fundamentally unfair. Blanco posits that the material would have enabled him to impeach the weight of the March 14, 1984, convictions as statutory aggravating circumstances by showing that he was wrongly convicted. And under Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), evidence that he did not commit the crimes would constitute a non-statutory mitigating circumstance.[68] Even though Blanco raised this claim in the first possible proceeding following his

_____

[68] In Lockett, the Supreme Court held that,

the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973 (1978).

61

resentencing, the Florida Supreme Court concluded that Blanco's Brady claim was procedurally barred. The District Court should have recognized this error and addressed the merits of the claim. The claim need not be remanded to the District Court for a merits determination, however, for, as we demonstrate below, the claim clearly fails.[69]

3.

Blanco's Brady claim is that the State withheld evidence of the deals it made with Fidel Romero and Enrique Gonzalez to aid its prosecution of Blanco for the crimes that took place at the Emerald Hills residence on December 29, 1981. We address the claim in two steps. First, we review the history of the prosecution, including when and how the State made deals with Romero and Gonzalez. Second, we identify at what point Blanco or his counsel became aware of the deals.

On April 9, 1982, a jury convicted Blanco and Enrique Gonzalez of armed robbery and armed burglary for their roles in the theft of a television from an Emerald Hills residence. Fidel Romero, who was indicted with Blanco and Gonzalez, was tried separately and convicted. Romero appealed his convictions,

---

[69] We decide this issue de novo because the Supreme Court of Florida did not make any determination on the merits. Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010) ("When, however, a claim is properly presented to the state court, but the state court does not adjudicate it on the merits, we review de novo." (citing Cone v. Bell, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784, 173 L. Ed. 2d 701 (2009))).

but they were affirmed on July 13, 1983.  See Romero v. State, 435 So. 2d 318, 321 (Fla. 4th Dist. Ct. App. 1983).  Blanco and Gonzalez also appealed.  Their convictions were reversed on August 31, 1983, based on an improper search and seizure.  See Blanco v. State, 438 So. 2d 404, 405 (Fla. 4th Dist. Ct. App. 1983).

The State chose to retry Blanco for both offenses.  To do that, the State decided to enlist Romero's and Gonzalez's cooperation.  To obtain Romero's, the State entered into this arrangement in December 1983: Romero's seventy-five-year prison sentence would be reduced to a sentence of 791 days, with credit for 791 days time already served, and a probation term of seven years' and six months'; Romero would testify truthfully against Blanco, keep in touch with the State Attorney's office, and submit to psychological evaluations and therapy, if necessary.[70]  The reduction of Romero's sentence occurred on March 22, 1984, when the Broward County Circuit Court resentenced Romero on the charges for which he had been convicted.

The State's deal with Gonzalez, reached on January 10, 1984, required him to plead guilty to both the robbery and burglary charges; be sentenced to prison for

---

[70] This information is drawn from the resentencing order entered on March 16, 1983.  At various points during his testimony in Blanco's retrial, Romero stated that the terms of his deal were that his sentence would be reduced from 75 years to 5 years.  This appears to be somewhat in conflict with the sentencing order, but the precise reduction is of no moment.  The key fact is that the State made a deal with Romero to reduce his sentence from 75 years to some drastically smaller time in exchange for his truthful testimony against Blanco.

63

two years, with credit for two years already served; and pay a public defender fee

of $2,600.[71]  The Broward County Circuit Court approved the arrangement on

March 23, 1984, taking Gonzalez's plea to the charges and imposing the agreed

upon sentence.

The date for Blanco's new trial was originally set for January 16, 1984.  On

January 13, 1984, Blanco's counsel presented the Circuit Court with two motions.

The first was a motion for a continuance.  The grounds for the motion were, in

relevant part:

> 1.  Prior to the State purchasing the testimony of the Co-defendant,
> Fidel Romero, the Defense was ready for trial.
>
> 2.  The State informed the Defense of its intention to use Fidel
> Romero as a witness when it provided a State Witness List on
> December 20, 1983, received by Defense counsel December 21, 1984
> [sic].
>
> 3.  Fidel Romero was not available for deposition until after January
> 4, 1984, and, because Fidel Romero's statement to Detective Rios
> stated only who was involved with no details of what happened or the
> plea offer, the Defense had no idea what he was going to say until
> Romero's deposition on January 9, 1984, one week before trial.

The second January 13 motion was a motion to require the State to divulge

plea negotiations.  It read, in relevant part:

> COMES NOW the accused, Omar Blanco, by and through his
> undersigned attorney, and moves this Honorable Court to require the

---

[71]  Although not expressly a term of his deal, Gonzalez was subsequently deported.

64

State Attorney to relate the entire plea negotiations between the State and/or and other law enforcement agency and the Defendant, Fidel Romero, and/or any other prosecution witness, including any agreement "off the record" between the State and the Defendant, Fidel Romero, or his/her attorney which could conceivably influence said witness' testimony[.]

Finally, on January 18, 1984, counsel moved the Circuit Court to dismiss the information or, in the alternative, to enter an order excluding Fidel Romero from testifying.  This motion stated, in relevant part:

Defendant moves the Court for an Order dismissing the Information herein or, in the alternative, for an Order excluding the co-defendant, Fidel Romero from testifying in the trial and as grounds would show that:

1.  On December 20, 1983, Fidel Romero, a co-defendant in this case was listed by the State as a witness against Omar Blanco.

2.  During his trial on February 3, 1982, Fidel Romero . . . testified that Omar Blanco was in the Keys on the evening of the Robbery.

3.  On December 13, 1983 Fidel Romero gave a statement under oath to Det. Bob Rios which briefly said that he, Enrique Gonzalez and Omar Blanco had committed the Robbery/Burglary.

. . . .

5.  Clearly in either his trial testimony of February 3, 1982, or in his [later statements] Fidel Romero committed the crime of Perjury.

6.  In order to obtain a conviction on the retrial of Omar Blanco, [the State] obtained the testimony of Fidel Romero by offering him a deal where if he testified favorably, Fidel's sentence would be mitigated from 75 years Florida State Prison with retention for 25 years to five years Florida State Prison with credit for two years time served and no

65

retention[.]

Blanco's trial began on March 12, 1984, and took two days. Romero testified for the State. Romero's direct examination, through an interpreter, provides some insight into the Brady claim before this court:

> [PROSECUTOR]: What was your sentence after you were convicted?
>
> [ROMERO]: Seventy-five year [sic].
>
> [PROSECUTOR]: All right. Now, you have made an agreement with the State of Florida, through me, to testify in this case; is that correct?
>
> [ROMERO]: Yes.
>
> [PROSECUTOR]: Tell these ladies and gentleman of the jury what the agreement is.
>
> [ROMERO]: The proposal was that if I testify the truth, instead of 75 years, it will go down to five.

Additionally, a relevant portion of Romero's testimony on cross-examination was as follows:

> [BLANCO'S ATTORNEY]: [Lieutenant Rios of the Fort Lauderdale Police Department] came and told you [Romero] about a deal that the State Attorney was willing to make with you, if you would testify against Mr. Blanco; is that correct?
>
> [ROMERO]: Yes, sir.
>
> [BLANCO'S ATTORNEY]: And that deal, Mr. Romero, was that in exchange for your testimony, your 75 years sentence would be reduced to five years, is that correct?

66

[ROMERO]: Yes, sir.

During his closing argument to the jury—on March 14, 1984—Blanco's

counsel continued to highlight that the State had made a deal with Romero in

exchange for his testimony:

> [BLANCO'S ATTORNEY]: So, Romero gets up there, denies the
> whole thing, the first time; then lo and behold, he comes down here,
> after he has gotten this great deal with the State, which, by the way,
> he told me—and you heard him—that he would do anything, anything
> to get out of jail[.]

On March 14, 1984, the jury found Blanco guilty as charged.  On March 27,

1985, his convictions were affirmed on appeal.  See Blanco v. State, 466 So. 2d

1152 (Fla. 4th Dist. Ct. App. 1985).

Fast-forwarding eight years later to the resentencing, Blanco claims that the

State failed to disclose its deals with Romero and Gonzalez when it announced that

it would use the March 14, 1984, convictions to establish an aggravating

circumstance before the jury.  Thus, his Brady claim.

The problem Blanco faces in prosecuting the claim is that the record

establishes that his attorneys[72] knew of the allegedly withheld information in 1984.

The three motions Blanco filed in January 1984 prior to his retrial reveal several

important facts: first, that Blanco's attorneys were aware that the State made a deal

---

[72] Two attorneys represented Blanco at his retrial for the Emerald Hills robbery and
burglary charges.

67

with Romero; second, that Blanco's attorneys were aware of at least the most important terms of the deal; third, that Blanco's attorneys had an opportunity to depose Romero where, presumably, his deal with the State was thoroughly explored; and fourth, that the State, in questioning Romero on direct examination at trial, revealed the deal and its terms.  Moreover, both Romero's and Gonzalez's plea arrangements were filed in the Circuit Court in March 1984 (March 22, 1984, for Romero; and March 23, 1984, for Gonzalez).  Blanco's attorneys had equal access to that information, which disclosed those arrangements and their terms.[73] See Parker v. Allen, 565 F.3d 1258, 1277 (11th Cir. 2009) ("[T]here is no suppression if the defendant knew of the information or had equal access to obtaining it." (citing Maharaj v. Sec'y of the Dep't of Corr., 432 F.3d 1292, 1315 n.4 (11th Cir. 2005))); Maharaj, 432 F.3d 1312–13 (rejecting a Brady claim even where the State did not turn over the actual report at issue when defense counsel

_____

[73]  Current Florida Rule of Criminal Procedure 3.852 would have allowed Blanco to seek the information included in public records.  See Fla. R. Crim. P. 3.852.  While Rule 3.852 did not exist at the time, Blanco nonetheless could have accessed public records and could have compelled the production of public records from the State Attorney's office and the local law enforcement agencies that had investigated the crime.  See, e.g., Reed v. State, 640 So. 2d 1094, 1098 (Fla. 1994); Hoffman v. State, 613 So. 2d 405, 406 (Fla. 1992); Tribune Co. v. Public Records, etc., 493 So. 2d 480, 482 (Fla. 2d Dist. Ct. App. 1986), cert denied, 503 So. 2d 327 (Fla. 1987); State v. Gillespie, 227 So. 2d 550, 555 (Fla. 2d Dist. Ct. App. 1969) ("By taking copious and diligent advantage of these rules a defendant in a criminal case in Florida can now avail himself of everything reasonably relevant and material to the case save Grand Jury proceedings (which we will discuss later), and that class of evidence, contemplated by Brady, which the prosecution would knowingly intentionally suppress."); see also Fla. Stat. § 119, et. seq. (1984) (describing public record policy).

68

had knowledge of the relevant facts, had equal access to the evidence, had an opportunity to depose the important witness to discover material, and had an opportunity to cross-examine the witness and did cross-examine the witness on the key issues).  We, therefore, conclude that because his attorneys were made fully aware of the information at issue and had access to it before the alleged Brady violation occurred, Blanco's Brady claim is meritless.

## III.

For the foregoing reasons, the judgment of the District Court denying Blanco's petition for a writ of habeas corpus is AFFIRMED.

SO ORDERED.